## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | **CRIMINAL NO. 17-CR-69** |
| | : | |
| **CANDACE MARIE CLAIBORNE** | : | |
| | : | |

### STATEMENT OF FACTS

The Government respectfully submits the following Statement of Facts in support of a plea of guilty by Candace Claiborne ("the defendant") to Count One of the Indictment in the above-captioned matter.

**I.    ELEMENTS OF THE OFFENSE**

To sustain a conviction for a violation of 18 U.S.C. § 371, Conspiracy to Defraud the United States, at trial, the government must prove the following elements:

(1) the Defendant entered into an agreement;

(2) to obstruct a lawful function of the United States or one of its Departments or agencies;

(3) by deceitful or dishonest means, and

(4) at least one overt act was committed in furtherance of the conspiracy.[1]

---

[1] See, *inter alia, United States v. Mellen*, 393 F.3d 175, 180-81 (D.C. Cir. 2004) (stating that "[i]n order to sustain a conviction for conspiracy under 18 U.S.C. § 371, the evidence must show that the defendant entered into an agreement with at least one other person to defraud the United States; that he knowingly participated in the conspiracy with the intent to commit the offense; and that at least one overt act was committed in furtherance of the conspiracy") (internal citations and quotations omitted).

1.      For federal employees with access to TOP SECRET information, federal regulations require reinvestigations every five years. As part of this process, investigators try to identify whether an employee "may be subjected to coercion, influence, or pressure which may cause him to act contrary to the best interests of the national security." To make this determination, investigators rely in part on the SF-86 Questionnaire for National Security Positions, which, among other things, asks applicants to identify all foreign nationals with whom they have or have recently had "close and/or continuing contact" and are "bound by affection, influence, common interests, and/or obligation."

2.      In addition, employees of the U.S. Department of State ("Department of State," "State Department," or "DoS") must report unofficial contact with a person whom the employee knows or suspects is a member of a foreign intelligence agency.  The term "contact" means all manners of personal or impersonal communication and includes, but is not limited to, written, telephonic, electronic mail, text messaging, and wire.  The relevant regulation requires employees to report such contacts immediately.  The employee must also report a concern that he or she may be the target of actual or attempted exploitation by a foreign entity.  Employees are warned that failure to report information required by this policy may result in the initiation of an appropriate investigation, immediate suspension of the employee's security clearance (which is a mandatory condition of employment for Department of State Foreign Service employees), and/or disciplinary action.

3.      Other regulations prohibit executive branch employees from accepting gifts. Pursuant to Title 5, Section 2635.202 of the Code of Federal Regulations and to Title 11, Section 613.1 of the Department of State's Foreign Affairs Manual ("FAM"), Department of State employees shall not directly or indirectly solicit or accept a gift that is either (1) from a prohibited

source, or (2) given because of the employee's position. A "gift" includes any gratuity, favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value, including services, meals, travel, and tickets to, or free attendance at, events. A "prohibited source" generally includes any person or entity seeking official action by the Department; doing business or seeking to do business with the Department; conducting activities regulated by the Department; or having interests that may be substantially affected by the performance or nonperformance of the employee's official duties.

4.    Under 5 U.S.C. § 7342, federal civil service employees are prohibited from receiving gifts above a "minimal value," as prescribed by regulations provided by the Administrator of General Services, from a "foreign government," a term that includes any "agent or representative" thereof. In 2011, "minimal value" was set at $350. In 2017, "minimal value" was set at $390. During the intervening period, "minimal value" was set between $350 and $390. This statutory prohibition is further expounded upon in Title 2, Sections 961 and 962 of the FAM.

5.    The Chinese Ministry of State Security ("MSS") may be described as an institution similar to the Federal Bureau of Investigation ("FBI") and the Central Intelligence Agency ("CIA") combined under one intelligence directorate responsible for counter-intelligence, foreign intelligence, and political security on behalf of the government of the People's Republic of China ("PRC" or "China"). The MSS consisted of a central ministry, provincial state security departments, and municipal state security bureaus, such as the Beijing State Security Bureau ("BSSB") and the Shanghai State Security Bureau ("SSSB").

6.    Among other things, the MSS and its regional bureaus were concerned with identifying and influencing the foreign policy of other countries, including the United States. The MSS and its bureaus sought to obtain information on political, economic, and security policies that

3

might affect China, foreign intelligence operations directed at China, and biographical profiles of foreign politicians and intelligence officers.

7.     Additionally, the MSS and its bureaus were tasked with conducting clandestine and overt human source operations, of which the United States was a principal target. These operations used trained intelligence case officers, as well as non-professional collectors called "cut-outs" or "co-optees." A cut-out or co-optee was a person trusted by both the source and the intelligence officer who helped to provide a layer of insulation between an intelligence officer and a source, and thereby increased operational security.

8.     Defendant Candace Claiborne ("Claiborne") was an Office Management Specialist ("OMS") with the Department of State. She was a United States citizen who maintained a permanent residence in Washington, D.C.  Claiborne earned a bachelor's degree in criminal justice and law enforcement from the University of the District of Columbia. She joined the Department of State in 1999, and served in a variety of places, including Washington, D.C., Baghdad, Iraq, Beijing and Shanghai, China, and Khartoum, Sudan. According to Department of State records, Claiborne had language proficiency in several languages including Mandarin Chinese.  Claiborne held a TOP SECRET security clearance at all relevant times since 1999.

9.     Co-Conspirator A was a close family member of Claiborne. He was a United States citizen, who lived in Los Angeles, California. He previously lived with or near Claiborne in Washington, D.C. and in China. Co-Conspirator A lived in China from 2000 through 2005, and then again from approximately January 2012 through August 2013. During the latter stay, Co-Conspirator A studied fashion design at the Raffles Design Institute at Donghua University in Shanghai.

10.     Co-Conspirator B was a Shanghai-based importer/exporter who ran a spa and restaurant in Shanghai. He was a citizen of the PRC who knew and regularly communicated with Claiborne and Co-Conspirator A since at least 2007. Co-Conspirator C was a PRC citizen and an agent of the PRC Intelligence Service ("PRCIS"). Co-Conspirator C worked closely with Co-Conspirator B and had frequent communications with both Claiborne and Co-Conspirator A since 2012. Co-Conspirators B and C, both of whom were agents of the PRCIS, specifically the SSSB, provided Claiborne and Co-Conspirator A with numerous gifts between 2011 and 2015.

11.     Claiborne and Co-Conspirators A, B, and C conspired to hide their close and continuing connections, as well as gifts, monies and services provided to Claiborne and Co-Conspirator A by Co-Conspirators B and C in order to keep Claiborne employed at the Department of State. This enabled Claiborne to continue to supply Co-Conspirators B and C with internal DoS information and continue to earn her salary. They carried this out through lies spoken or written to Claiborne's background investigators and to law enforcement, and through attempted deletions of relevant communications evidencing this contact or gifts.

12.     Around the time that Claiborne joined the Department of State, Claiborne signed an Oath of Office that read, "I will support and defend the Constitution of the United States against all enemies foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God."

13.     Claiborne's first duty post with the Department of State was the United States Embassy in Beijing, China. Before departing for China, Claiborne completed foreign language training in Mandarin Chinese at the Department of State's Foreign Service Institute ("FSI") in Arlington, Virginia. Claiborne began working in Beijing in or around March 2000.

14.     There, she was an OMS for the Economic Minister Counselor and for the Security Engineering Center at the embassy. As an OMS, Claiborne was required, as a condition of employment, to obtain and maintain a TOP SECRET clearance. Her duties included providing office management and administrative support to senior U.S. diplomats and to various embassy sections, to include among other things, managing meeting calendars for senior staff, preparing agendas and support materials for meetings, helping ensure that classified information was properly secured, and editing and revising documents and reports prepared by diplomatic personnel. Claiborne's first Beijing tour of duty concluded in or around June 2003.

15.     Claiborne's next Department of State posting was also in China, this time at the United States Consulate General in Shanghai. There, Claiborne served as the OMS to the Executive Assistant to the Consul General from approximately August 2003 through July 2005. Throughout Claiborne's tours of duty in both Beijing and Shanghai, Co-Conspirator A lived with her in China.

16.     After China, Claiborne worked as an OMS to the Deputy Chief of Mission in Buenos Aires, Argentina, from approximately 2005 through the summer of 2007, before returning to the United States to enroll in Arabic courses at the Department of State's FSI. Claiborne's next posting was in Baghdad, Iraq, where she worked as an OMS for the Political Affairs Section from approximately June 2008 through July 2009.

17.     After Iraq, Claiborne returned to Beijing, China, where she worked at the United States Embassy as the OMS for the Minister Counselor for Public Affairs. Claiborne's third tour in China lasted from approximately November 2009 through November 2012. Starting in approximately January 2012, Co-Conspirator A lived with Claiborne in Beijing. Co-Conspirator A moved to Shanghai in approximately July 2012, staying there until August 2013.

6

18.     Claiborne thereafter continued to hold various positions at the Department of State until her arrest in March 2017.

19.     While employed at the Department of State, Claiborne received periodic counterintelligence trainings and briefings, including multiple times during her tenure in China. These briefings and trainings detailed Claiborne's obligations to, among other things, complete a Foreign Contact Report after any unofficial contact with a person that she "knows or suspects is a member of a foreign intelligence agency." Due to her TOP SECRET clearance, at all relevant times, Claiborne was required to report any unofficial contact with a person that she "knows or suspects is a member of a foreign intelligence agency." In order to maintain her TOP SECRET clearance, every five years, Claiborne was required to provide information for a background investigation that included information regarding her foreign contacts, including contacts with representatives of foreign governments and with foreign nationals with whom Claiborne had "close and/or continuing contact" and with whom she was bound by "affection, influence, common interests, and/or obligation."

20.     Claiborne's close and continuing contact with Co-Conspirator B, a Chinese national, began in or around 2007 and continued until at least 2016. Claiborne's close and continuing contact with Co-Conspirator C, a Chinese national, began in or around 2012 and continued until at least 2015. During that time period, Claiborne and Co-Conspirator A routinely accepted gifts from Co-Conspirators B and C.

21.     On or about April 11, 2011, Claiborne received $2,480 by wire into her USAA account. The wire originated from Delta Shipping Co. Ltd./Bank of China Hong Kong, and the memo line read, "For [Co-Conspirator B] Shanghai."

22.     Claiborne failed to report to the Department of State either the continuing contact

7

with Co-Conspirator B, or the monies she received on or about April 11, 2011, despite a reminder notice issued to all Beijing Department of State personnel the previous month reminding employees of their obligation to report gifts over $350 from foreign governments.

23.     A month later, on or about May 10, 2011, Co-Conspirator B tasked Claiborne by email with questions regarding the Chinese currency exchange rate and the United States Government's response to the U.S.-Sino Strategic Economic Dialogue.  Co-Conspirator B inquired about the "internal evaluation of the fruits and consensus . . . made by the US government" from the U.S. – Sino Strategic Economic Dialogue, and also wanted information about what types of pressures the United States government planned to place on the Chinese government if certain expectations were unmet. Finally, he inquired about the "internal attitudes taken by the high-level American officials."  Claiborne failed to report to the Department of State the tasking she received from Co-Conspirator B on or about May 11, 2011.

24.     On or about May 19, 2011, after Claiborne answered Co-Conspirator B's tasking with responsive, but publicly available information, Co-Conspirator B clarified, "What they are looking for is what they cannot find on Internet."  On or about the same date, Co-Conspirator B, consistent with his PRCIS affiliation, emphasized caution in the mode of communication. He warned Claiborne, "If you find something next time don't send them by email bcs [sic] others also can catch it with Internet."  Co-Conspirator B offered to personally pick up any information Claiborne passed.

25.     On or about July 13, 2011, Claiborne received a $580 wire into her U.S. bank account from Delta Shipping Co Ltd./Bank of China. Again, the memo read, "For [Co-Conspirator B] Shanghai."  Claiborne failed to report to the Department of State the gift she received from Co-Conspirator B on or about July 13, 2011.

26.     In or around January 2012, Claiborne met Co-Conspirator C and began to have close and continuing contact with him. On or about January 13, 2012, Co-Conspirator C emailed Claiborne, saying, "There is some feedback about our last talk, which I think is positive . . . besides, I prepare new year gifts for you." Co-Conspirator C suggested they meet in Beijing, and asked Claiborne to tell Co-Conspirator A hello. Claiborne wrote back, "I'll see you soon."

27.     Thereafter, for the duration of her position in China, Claiborne met with co-conspirator B and Co-Conspirator C regularly. These in-person meetings generally occurred once or twice per month.  Prior to each meeting, Claiborne would receive a communication from Co-Conspirator B or C requesting information on an upcoming meeting between the United States and China, visits by U.S. or Chinese dignitaries to the other country, or dialogues or plans between the two countries that were of interest to China.  Claiborne was aware through emails and conversations with Co-Conspirators B and C that the information they sought was not public information, but instead was information internal to the Department of State or U.S. Government that would provide an advantage to Chinese officials.  Due to their requests for information and their methods, Claiborne believed that Co-Conspirators B and C were agents of the Chinese government.

28.     Claiborne used her access to official Department of State systems at her office to search the internal networks of the Department of State for cables, white papers, or other non-public, official government documents responsive to the request. She would print out these materials, place them in a manila envelope, and deliver them to Co-Conspirator B or Co-Conspirator C at in-person meetings. In return, she would receive an envelope containing a significant amount of Chinese currency. Claiborne received the equivalent of approximately US $20,000 in Chinese currency from Co-Conspirator B and Co-Conspirator C over the course of her dealings with them.

29.     In addition to Chinese currency, Claiborne or Co-Conspirator A received other gifts from Co-Conspirators B and C. These gifts took the form of air travel for Claiborne or Co-Conspirator A, including roundtrip tickets to the United States and to Thailand for Co-Conspirator A; tuition, rent and living expenses for Co-Conspirator A for approximately one year, while he was enrolled in a fashion design program; as well as many smaller gifts of electronics, local goods, or other merchandise for both Claiborne and Co-Conspirator A.

30.     Further, during this period, Co-Conspirator B and Co-Conspirator C performed numerous services for Claiborne and Co-Conspirator A, such as lining up employment for Co-Conspirator A, purchasing goods or services via the internet, and assisting them with passport and visa issues.  Claiborne understood that Co-Conspirators B and C provided these gifts and cash to her and to Co-Conspirator A in exchange for the internal DoS information she was providing to them.

31.     Claiborne understood that both her close and continuing contacts with Co-Conspirators B and C, as well as her acceptance from them of gifts, services, and money in exchange for Department of State documents and information was conduct that she was required to report to the DoS.  Claiborne did not report this conduct because she understood that doing so would result in the loss of her security clearance and of her employment by the DoS, and therefore the loss of her salary as well.  In total, the amount of gifts, money, services Claiborne and Co-Conspirator A received during the period of the conspiracy, combined with Claiborne's Department of State salary, well exceeded $550,000.

32.     On or about November 26, 2012, Claiborne completed an Exit Interview Form supplied by the U.S. Embassy Regional Security Office in Beijing, China. Under the heading Foreign National Contacts, Claiborne listed "None." Under the heading Any Other Unusual

Incidents or Anomalies to Report, Claiborne observed seeing an "Asian man standing at the south gate every day at 12:00 – 1:00 lunchtime." Claiborne mentioned nothing about her close and continuing contacts with Co-Conspirators B and C, including the May 2011 tasking by Co-Conspirator B or the various gifts and benefits that Co-Conspirators B and C had provided to Claiborne and Co-Conspirator A or the currency she received in exchange for providing them internal State Department documents.

33.     The close and continuing contacts between Claiborne, and Co-Conspirators A, B and C continued after Claiborne left her duty posting in China.  Throughout until August 2013, Co-Conspirators B and C continued to pay Co-Conspirator A's living expenses, tuition, and rent, and provided him other assistance.  For example, on or about February 17, 2013, Claiborne told Co-Conspirator B that Co-Conspirator A was short on cash, and requested that Co-Conspirator B help him. Co-Conspirator B seemed perplexed, responding that he had just transferred "3,000" to Co-Conspirator A on February 1, 2013.

34.     On or about October 26, 2014, Claiborne submitted via electronic wire her completed SF-86 questionnaire for her national security clearance background check. The SF-86 instructions page warned Claiborne that "[a]ll questions on this form must be answered completely and truthfully in order that the Government may make the determinations described below on a complete record. Penalties for inaccurate or false statements are discussed below." In the section entitled "Penalties for Inaccurate or False Statement," the instructions advised, "The U.S. Criminal Code (title 18, section 1001) provides that knowingly falsifying or concealing a material fact is a felony which may result in fines and/or up to (5) years imprisonment." The instructions further stated, "This form will be used by the United States (U.S.) government in conducting background

investigations, reinvestigations, and continuous evaluations of persons under consideration for, or retention of, national security positions."

35.    On or about October 26, 2014, Claiborne answered "No" in response to Section 19 of the SF-86, entitled "Foreign Contacts," which asked, "Do you have, or have you had, close and/or continuing contact with a foreign national within the last seven (7) years with whom you, or your spouse, or cohabitant are bound by affection, influence, common interests, and/or obligation?"

36.    On or about October 26, 2014, Claiborne answered "No" in response to Section 20B of the SF-86, entitled "Foreign Business, Professional Activities, and Foreign Government Contacts," which asked, in relevant part under the subheading "Foreign Government Contact," whether during the past seven years Claiborne or anyone in her immediate family "had any contact with a foreign government, its establishment (such as embassy, consulate, agency, military service, intelligence or security service, etc.) or its representatives, whether inside or outside the U.S.?" Claiborne's familial relationship with Co-Conspirator A is within the definition provided for "immediate family."

37.    On or about October, 26, 2014, before submitting the SF-86, Claiborne certified as follows: "My statements on this form, and on any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith. I have carefully read the foregoing instructions to complete this form. I understand that a knowing and willful false statement on this form can be punished by fine or imprisonment or both (18 U.S.C. 1001). I understand that intentionally withholding, misrepresenting, or falsifying information may have a negative effect on my security clearance, employment prospects, or job status, up to and including denial or revocation of my security clearance, or my removal and debarment from Federal service."

38.     On or about October 26, 2014, under the section of the SF-86 entitled "Statement of understanding," Claiborne affirmatively answered that "I have read the instructions and I understand that if I withhold, misrepresent, or falsify information on this form, I am subject to the penalties for inaccurate or false statement[s] (per U.S. Criminal Code, Title 18, section 1001)."

39.     On a date unknown to the Grand Jury but before on or about July 10, 2015, Claiborne wrote a journal entry that read, "[Co-Conspirator B]: Business plan, Generate 20k in 1 year." Claiborne also wrote, "Clean up yahoo email contacts." Claiborne used a Yahoo email address as one means to communicate with Co-Conspirators B and C.

40.     On or about July 14, 2015, Claiborne informed Co-Conspirator B that she would be in Beijing for a quick visit that week, and that she would try to call him.

41.     On or about September 1, 2015, Claiborne, having recently returned from China, where she met with Co-Conspirators B and C, emailed Co-Conspirator B her USAA bank account information, saying, "I thought I would go ahead and send you this . . . if that's ok. I'll call u tomorrow."

42.     On or about September 5, 2015, Claiborne wrote, "Hi [Co-Conspirator B], hope all is well. Just wanted to know if you will be able to help me out." The subject line of the email was "Home repairs." Co-Conspirator B responded, "Hi Candace, we are on holiday these days. Can you inform me clearly the 5k to which account?"

43.     On or about September 6, 2015, Claiborne wrote back to Co-Conspirator B, provided her USAA account information, and said, "I'm sorry to disturb you while on vacation I didn't know. You can send it to my checking acct which is below. Are you in Europe? Enjoy yourself. I can wait until you return. I start school for Spanish training this week."

44.     On or about September 8, 2015, Claiborne responded to an email from the
Department of State about scheduling an appointment for her background investigation interview.
The email, from a contract Special Investigator with the Bureau of Diplomatic Security, noted that
Claiborne "didn't list any foreign contacts or foreign travel" in her SF-86. The investigator
requested that "if there is anyone or any trip that you have forgotten please use the attached
templates to provide that information." Claiborne attached supplemental foreign contact and foreign
travel information, saying, "I started this process so long ago. Sorry I don't remember these
achievements. I have filled them out to the best of my knowledge. I am not sure of what your
definition of foreign contacts are."

45.     On or about September 8, 2015, for her supplemental foreign contacts, Claiborne
listed an education professor in China, a retired martial arts teacher in China, and an executive
assistant to the ambassador at the Barbados Embassy in China. She did not list Co-Conspirators B
and C, despite her long-standing, close, and continuing contacts with them.

46.     On or about September 8, 2015, Claiborne contacted the education professor in
China whom she had listed in her supplemental list of foreign contacts. She wrote, "Hi I am doing
my security clearance... someone may contact you by email. i said that I have met you since 2000..
we are colleagues/friends... we contact one another by email occasionally...thats all... you showed
me around beijing during my first stay... nothing more...and that's the truth!"

47.     On or about September 9, 2015, Claiborne called Co-Conspirator A and asked him
how to delete her WeChat account. WeChat is a Chinese-based communications app that Claiborne
used to communicate with Co-Conspirators B and C.

48.     On or about September 9, 2015, Claiborne emailed Co-Conspirator B to instruct him
not to send any money while her background investigation was ongoing, writing, "Very busy this

week I have language orientation and my security clearance interview so I'm putting everything on hold until that's cleared."

49.     On or about September 10, 2015, during a "point-by-point review" of her security forms with the background investigator, Claiborne, despite being warned at the start of the interview that "18 USC 1001 makes it a crime to knowingly falsify or conceal material facts related to this investigation," made materially false statements and omissions, including the following:

A.     Claiborne claimed that Co-Conspirator A's only trip out of the country was a pleasure trip to Africa. Claiborne failed to mention anything about Co-Conspirator A's extensive travels and stays in China, including his year living in Shanghai housing provided by Co-Conspirators B and C.

B.     Claiborne denied accepting financial support from any person or entity outside of her employment.

C.     Claiborne claimed she had no "close ties of affection or obligation" to a citizen or resident of a foreign country, other than those she had listed (which did not include Co-Conspirators B and C).

D.     Despite making no mention of Co-Conspirators B and C, Claiborne denied failing to report any contacts with foreign nationals. Claiborne specifically averred that she maintained no contact with any foreign nationals, including through any social media, including Snapchat, Skype, or Facebook.

E.     Claiborne denied that any foreign contact had ever asked for "special favors" or had any influence over her. Claiborne stated that no foreign contact had ever asked probing questions about her work, asked her to participate in a clandestine meeting, or introduced her to members of a foreign intelligence agency or government.

F.      Claiborne asserted that she had no "unauthorized association with a suspected or known collaborator or employee of a foreign intelligence service ["FIS"] and Claiborne [had] no knowledge or suspicions of ever having been a target of interest of a FIS."

G.      Claiborne denied accepting any "educational, medical, or other benefits . . . from a foreign country."

H.      Claiborne said that she had not "deliberately omitted, concealed, or falsified relevant and material facts from any personnel security questionnaire, personal history statement, or similar form used to conduct investigations . . . [or] determine security clearance eligibility or trustworthiness."

I.      Claiborne asserted she had not "deliberately provided false or misleading information concerning relevant and material matters to [any representative] in connection with a personnel security or trustworthiness determination."

50.     On or about September 11, 2015, Claiborne asked the background investigator by email, "When will I be informed about the completion of my clearance?"

51.     On or about September 11, 2015, Claiborne called Co-Conspirator A, who was living in Claiborne's house in Washington, D.C., to tell him about her security clearance interview. She complained about how many questions she was asked, including about whether people like Co-Conspirator A had "traveled abroad." Claiborne told Co-Conspirator A that she said he had only gone to Africa. While she did not think Co-Conspirator A would be contacted, she made sure he knew that she "didn't say anything about . . . um . . . ya know," referring to China. Claiborne said she would tell him more when she saw him. Claiborne also acknowledged that if she was not fully forthcoming, she could lose her job.

52.     On or about September 13, 2015, Co-Conspirator B emailed Claiborne, asking, "Did everything clear now?" Claiborne immediately responded, "Clear all messages please. Everything below . . ."

53.     On or about September 13, 2015, after Claiborne called Geotelecom customer service to learn how to dial a cell phone number in China using her calling card, Claiborne made a phone call to Co-Conspirator B using her calling card. Co-Conspirator B asked whether everything was alright. Claiborne responded, "Yes. I want to say yes, so. I didn't want to email because now . . . it, it take a while for the whole process to be finish." Claiborne elaborated, "They ask, oh so many questions. You have no idea." Co-Conspirator B responded, "So, so, so I can't transfer the 5k to your that . . . to the account?" Claiborne replied, "No, no, no, no, no. No, no, no, no, no." Claiborne said, "I will tell you a little later. You know when it's all, when it's all finished." Co-Conspirator B responded, "Okay, okay, no problem. . . I will wait." Claiborne then encouraged the deletion of prior communications.

54.     On or about June 7, 2016, after Co-Conspirator A boarded a plane bound for China, he spoke by phone with Claiborne. Co-Conspirator A told Claiborne he would set up WeChat once he arrived. Claiborne instructed Co-Conspirator A, "If you happen to talk to [Co-Conspirator B] or any of them, just say… [Claiborne] is working in D.C. I'm sure they'll ask – they're spies."

55.     On or about July 12, 2016, Co-Conspirator B emailed Claiborne, "Hi Candace, long time no see! How is life in DC? Found [Co-Conspirator A] is back in Shanghai? What do you want me to do for him?" Claiborne responded, thanking Co-Conspirator B for the offer, but saying, "I don't need you to do anything for [Co-Conspirator A]."

56.     On or about July 12, 2016, Claiborne asked Co-Conspirator A whether he had seen Co-Conspirators B or C. Co-Conspirator A answered that he had not.

57.     During Co-Conspirator A's reentry to the United States from China, in response to questioning by a CBP agent, Co-Conspirator A said that he had been to China many times, but denied having ever lived anywhere other than Beijing. Co-Conspirator A omitted that he had lived in Shanghai for a year at the expense of Co-Conspirators B and C.

58.     On or about August 23, 2016, during the course of a voluntary interview in Washington, D.C. at the FBI's Washington Field Office with an FBI Special Agent and a Joint Terrorism Task Force Officer, Claiborne, having been warned that "it's a crime to lie to federal agents," made materially false statements and omissions, including the following:

A.     Regarding her most recent trip to China (in the summer of 2015), Claiborne claimed that she did not meet with any foreign government officials. By contrast, in October 2015, Co-Conspirator A emailed Co-Conspirator B, who was a PRCIS agent, saying, "[Claiborne] said she met with you on her last trip to Shanghai." And later, in a March 28, 2017 voluntary interview with the FBI, Claiborne admitted to meeting with Co-Conspirators B and C during her summer 2015 trip to China.

B.     When asked whether she maintained contact with any Chinese foreign nationals, Claiborne omitted any mention of Co-Conspirators B and C.

C.     When asked directly whether she "ever had contact with representatives of any foreign entity or intelligence agency while either overseas or here in the U.S.," Claiborne responded, "No," adding, "those are the same things we have to report in our clearance."

D.     Claiborne falsely denied that any of her close family members maintains contacts with any Chinese government officials. She omitted any reference to Co-Conspirator A's connections with Co-Conspirators B and C, who were both PRCIS agents. When asked if Co-Conspirator A still travels, Claiborne responded, "Well, he's in California now. He was in DC last

year, and he's in California. I don't know what he's doing exactly. He's trying to go back to school."
Claiborne failed to mention that she knew Co-Conspirator A had just returned from China the
previous month.

      E.     Claiborne acknowledged that Co-Conspirator A had attended fashion school in
China, but misrepresented how his education was funded. When asked directly, "Who paid for
that?" Claiborne responded, "I think he paid for it. . . I think he had like some kind of scholarship."
Claiborne said nothing about Co-Conspirators B and C providing the tuition payments, housing
costs, and living expenses for Co-Conspirator A.

      F.     Claiborne falsely stated that no one had ever offered to provide travel benefits for
her other than the U.S. government.

      G.     Claiborne additionally falsely denied having ever been offered any "gifts, benefits,
money" by a foreign national. Claiborne volunteered, "That's the kind of stuff we have to report."

      59.     On or about August 23, 2016, about three hours after her interview at the FBI's
Washington Field Office had concluded, Claiborne left her desk at the Department of State to call
Co-Conspirator A from her cell phone. She asked him if he had received a scholarship when
attending the fashion school in China. Co-Conspirator A responded, "Not that I know of." Claiborne
falsely insisted otherwise.

      60.     On or about August 23, 2016, about seven minutes after her cell-phone call to Co-
Conspirator A, Claiborne called Co-Conspirator A again, this time not from her cell phone or from
her desk phone, but from a phone booth located three floors below Claiborne's office in the
Department of State. Claiborne told Co-Conspirator A that CBP had previously stopped her,
searched her bags, and asked questions. Claiborne then explained how earlier that day, the FBI had
asked questions about where she had been and why. Claiborne relayed to Co-Conspirator A that

she told the FBI she had not taken money or gifts, and that Co-Conspirator A had been on scholarship while at the art school. Claiborne explained to Co-Conspirator A that during a national security clearance investigation, a lot of questions get asked about your family because of the clearance you hold and the access you have to certain documents. As a result, Co-Conspirator A needed to be careful with what he said and did, because his actions could lead back to Claiborne. Co-Conspirator A told Claiborne, apparently for the first time, that he too was stopped by CBP after his most recent trip to China. CBP searched his belongings outside his presence and required him to unlock his phone, just as they had done with Claiborne. This information prompted Claiborne to express concern and speculate that CBP's actions had something to do with their visits to China, and that they should "stay away from that for now." Claiborne asked Co-Conspirator A when he studied in China, to which Co-Conspirator A answered 2012 to 2013. Claiborne reiterated her point from the earlier call that Co-Conspirator A was "on scholarship, and they paid for your housing," expressing that she did not want any trouble. After the call, Claiborne returned to her desk.

61.     On or about the evening of August 23, 2016, Claiborne called Co-Conspirator A again. The call once more was focused on the CBP searches in light of the FBI interview earlier that day. Claiborne asked Co-Conspirator A more specific questions about his recent stop by CBP, including about the questions CBP asked and about the search of his electronics. Claiborne expressed to Co-Conspirator A that "you don't really know what to think, you know, who to trust." Claiborne warned Co-Conspirator A that a person's words could be used against that person at some point. Claiborne was uncomfortable with CBP going through her iPhone, so she got a new phone. Claiborne advised Co-Conspirator A to clean his "stuff up," and to be mindful of his words and actions.

62.     On or about that same evening of August 23, 2016, Claiborne emailed Co-Conspirator A, writing, "I'm sorry u were harassed at airport. U should have told me. When are you coming home for a visit? Be mindful and clean up your computer, Facebook etc. People will hunt for anything."

63.     The next day, on or about August 24, 2016, Claiborne sent Co-Conspirator A an e-card message using the service Birthday Alarm. The message's subject was "Happy Birthday," even though Co-Conspirator A's birthday occurred five days before, and Claiborne had conveyed birthday greetings by phone to Co-Conspirator A on his actual birthday. The message, however, had little to do with Co-Conspirator A's birthday. To the contrary, it read, "I hope you enjoyed your day. May Allah bless you with health and happiness. Btw delete all email messages and contact information in your email and phone pertaining to [Co-Conspirator B] and [Co-Conspirator C] – I don't want any trouble going forward ok – please do this immediately! Messages, nos, anything having to do with that fashion school your apartment anything – even from wechat, fb, skype, etc u got me?"

64.     That same day, on or about August 24, 2016, Claiborne asked a T-Mobile representative whether it was possible to batch delete numbers from an iPhone 6s.

65.     On or about January 26, 2017, Claiborne met with an FBI undercover employee ("UCE") whom Claiborne believed was an agent of the PRC government associated with Co-Conspirators B and C. The UCE was standing outside Claiborne's home in Washington, D.C. when Claiborne returned from work. It was cold and dark outside. Nevertheless, Claiborne admitted the stranger into her home after he described himself as "[Co-Conspirator C] and [Co-Conspirator B]'s colleague."   Over the next 1.5 hours, Claiborne and the UCE engaged in a wide-ranging conversation. The UCE, explaining that he worked for the MSS and that Co-Conspirators B and C

were with the SSSB, stated that the MSS considered Claiborne to be one of its "highest regarded" friends.  The UCE went further, thanking Claiborne, on behalf of the MSS, for her past assistance. Claiborne did not deny this assistance, but did refuse to continue providing assistance or receiving benefits, including cash proffered on the spot by the agent. As Claiborne articulated, "Things are not the way they used to be." Rather, she now had "to do security stuff all the time." In particular, she had been asked "just way too many questions" about "travels" and "foreign contacts." Moreover, Claiborne complained that during national security clearance investigations, "they ask us about this kinda stuff . . . like your relationship with foreign governments."

66.    In accordance with the request of the UCE, Claiborne failed to report to the Department of State her conversation with the UCE, in violation of Department of State requirements.

67.    Claiborne at no time reported to the Department of State the close and continuing contacts that she had with Co-Conspirators B and C or the gifts, monies, and other benefits that she and Co-Conspirator A received from Co-Conspirators B and C.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By:

Thomas A. Gillice,
D.C. Bar No. 452336
National Security Section
United States Attorney's Office
555 4th Street NW, 11th Floor
Washington, D.C. 20530
(202) 252-1791

Julie A. Edelstein
D.C. Bar # 976558
Evan N. Turgeon
D.C. Bar # 1010816
Counterintelligence and Export Control Section
National Security Division
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
202-233-2260

Dated: April 24, 2019

### *Defendant's Acceptance*

I have read each of the pages which constitute the government's Statement of Facts and have discussed it with my attorney, David Bos, Esquire. I fully understand this proffer and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in my plea agreement. I am satisfied with the legal services provided by my attorney in connection with this proffer and my plea agreement and matters related to it.

Date: 4/24/19

Candace Claiborne
Defendant

### *Attorney's Acknowledgment*

I have read each of the pages that constitute the government's Statement of Facts, reviewed them with my client, and discussed the provisions of the proffer with her, fully. These pages accurately and completely set forth the government's proof as I understand it.

Date: 4/20/19

David Bos, Esq.
Attorney for Defendant Candace Claiborne

24