**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 17-CR-00069** |
| | : | |
| **CANDACE MARIE CLAIBORNE,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

Defendant Candace Claiborne ("the defendant") joined the Department of State ("State Department" or "DoS") in 1999 as an Office Management Specialist ("OMS").   As a requirement of her position, the defendant held a TOP SECRET security clearance and had access to classified information.   Due to her position at the State Department, the defendant had an obligation to report foreign contacts and refrain from accepting all but minimal foreign gifts.   As a security clearance holder, she owed the United States a unique degree of loyalty.   Indeed, when the defendant joined the State Department, she swore an oath "to defend the Constitution of the United States against all enemies foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office . . . ."   Dkt. 58 (Statement of Facts (hereinafter, "SOF")) ¶ 12.

Notwithstanding these obligations, the defendant maintained a close relationship with two agents of the People's Republic of China ("PRC") Intelligence Service ("PRCIS").   SOF ¶ 10 *et seq.*   For years, she failed to report her foreign contacts, and then provided her Chinese handlers internal State Department documents and information in exchange for extensive gifts, monies, and

services provided to her and a close family member.   The defendant further took steps to conceal these contacts and gifts, lying to her employer and to law enforcement and destroying evidence in the process.   The defendant has now has admitted to this conduct and pleaded guilty to conspiring to defraud the United States and.

In the words of Department of State Counterintelligence Branch Chief Paul Higgins, "[the defendant's] failure to report gifts and foreign contacts resulted in the provision of information to the Chinese government that, in [his] opinion, had the potential to cause harm to the . . . national security of the United States." *See* Declaration of Paul Higgins [1] (hereinafter, "Higgins Declaration") at ¶ 10, attached as Exhibit A.   A sentence of five years—which is lower than the bottom of the Sentencing Guidelines range but is the statutory maximum for the offense of conviction—and three year period of supervised release a fine equivalent to the monetary value of the gifts and monies received from co-conspirators would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a).   The Government submits this Memorandum in support of this position, and to assist the Court in fashioning an appropriate sentence.

## I.      PROCEDURAL BACKGROUND

On March 28, 2017, the Federal Bureau of Investigation ("FBI") arrested the defendant based on the conduct described in an affidavit in support of a Complaint filed with the Court on that same day.   Dkt. 1, Ex. A.   On April 11, 2017, the defendant was charged in a five-count indictment with Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371; Obstructing an Official Proceeding, in violation of 18 U.S.C. § 1512(c); two counts of False

---

[1] Paul Higgins is a Supervisory Special Agent and the current Western Hemisphere Branch Chief, Investigations Division, of the Office of Counterintelligence for the Diplomatic Security Service of the U.S. Department of State.

Statements, in violation of 18 U.S.C. § 1001; and Wire Fraud, in violation of 18 U.S.C. § 1343.

In November and December of 2018, the defendant and her counsel engaged in a series of discussions with the government during which the defendant admitted to knowing that Co-conspirators B and C were agents of the PRCIS.[2]   The defendant further admitted to providing them with internal State Department cables, white papers, and other sensitive internal but unclassified information and documents in response to specific requests they made, and indicated that these requests usually concerned current events.   She described searching internal State Department electronic files for the requested information, printing that information, and handing it to Co-Conspirator B or C in exchange for an envelope of cash.   These admissions, combined with information the government had learned through its investigation, were incorporated into the conduct described in the Statement of Facts to which she pleaded guilty.   On April 24, 2019, the defendant entered a plea of guilty to Count One in the Indictment, which charged her with Conspiracy to Defraud the United States.

## II.   FACTUAL BACKGROUND

### A. The Defendant Developed a Close, Years-Long Relationship with Two PRCIS Agents.

After joining the State Department as an OMS in 1999, the defendant worked in a variety of places, including Washington, D.C; Baghdad, Iraq; Beijing and Shanghai, China; and Khartoum, Sudan.   SOF ¶ 8.   Specifically, she worked in Beijing from approximately March 2000 through June 2003, Shanghai from approximately August 2003 through July 2005, and

---

[2] These discussions were memorialized by FBI agents and provided to the defendant in discovery in advance of the plea hearing.   These same memorializations, along with the Statement of Facts, were provided to DSS Branch Chief Paul Higgins prior to his drafting of the declaration attached hereto as Exhibit A.

Beijing again from approximately November 2009 through November 2012.  *Id.* ¶¶ 13-15, 17. The defendant is proficient in Mandarin Chinese, among other languages.  *Id.* ¶ 8.  Co-Conspirator A, a close family member of the defendant's lived with her in China during different periods, including one period that began in approximately January 2012.  *Id.* ¶¶ 9, 17.  Co-Conspirator A then resided in Shanghai between approximately July 2012 through August 2013. *Id.*

Beginning in or around 2007 and continuing until at least 2016, the defendant and Co-Conspirator A had close and continuing contact with a PRC citizen who was a Shanghai-based importer/exporter who ran a spa and restaurant in Shanghai and was an agent of the PRCIS ("Co-Conspirator B").  *Id.* ¶ 10.  Beginning in or around 2012 and continuing until at least 2015, the defendant and Co-Conspirator A also had frequent communications with a PRC citizen who was a PRCIS intelligence officer and who worked closely with Co-Conspirator B ("Co-Conspirator C").  *Id.* ¶¶ 10, 20.

**B. The Defendant Failed to Report Foreign Contacts, Gifts, and Requests for Internal State Department Information to Her Employer.**

Starting in 1999, while employed at the State Department, the defendant received counterintelligence trainings and briefings, including multiple times during her tenure in China. *Id.* ¶ 19.  These trainings repeatedly reinforced the requirement that she report any unofficial contact with a person she knows or suspects is a member of a foreign intelligence agency.  *Id.* Other regulations prohibited the defendant from accepting gifts of any more than minimal value, and required her to report any close or continuing contacts with foreign nationals.  These periodic trainings, and reminders of these requirements, continued throughout the defendant's tenure at the State Department.

Despite these frequent reminders and consistent reporting requirements, the defendant never reported her extensive contacts with Co-Conspirators B or C, never reported their requests for internal State Department documents, and never reported any of the cash or gifts they provided to her and Co-Conspirator A.   Instead, as further described below, the defendant and her co-conspirators took numerous steps to conceal these activities from her employer and from investigators.

### C.   The Defendant Provided Non-Public, Sensitive U.S. Government Information to the PRCIS in Exchange for Copious Cash and Benefits.

Beginning in 2011, Co-Conspirators B and C routinely provided gifts to the defendant and Co-conspirator A.   For example, on July 13, 2011, the defendant received $580.   *See id.* ¶ 24. This payment, received by wire transfer into her U.S. bank account along with a memo that read "For [Coconspirator B] Shanghai," came just weeks after Co-Conspirator B requested that the defendant provide internal State Department information relating to the U.S.-Sino economic dialogue then ongoing. *Id.* ¶¶ 23 - 25.

For the remainder of the defendant's posting in China, the defendant met regularly with Co-Conspirators B and C.   Prior to their meetings, Co-Conspirators B and C would request information of interest to the Chinese government, such as internal information on an upcoming meeting between the United States and China, visits by U.S. or Chinese dignitaries to the other country, or dialogues or plans between the two countries.   *Id.* ¶ 27.   The defendant followed through on these requests and provided non-public information.   She misused her access to official State Department computers to search the State Department's internal network for cables, white papers, or other non-public, official government documents responsive to the Chinese officials' requests.   The defendant would then print out these materials, place them in a manila

envelope, deliver them to Co-Conspirator B or Co-Conspirator C at in-person meetings, and receive an envelope of cash in return. *Id.* ¶ 28.

Co-Conspirators B and C made clear in their symbiotic relationship with the defendant that they were interested only in receiving non-public information from her. On May 10, 2011, Co-Conspirator B tasked the defendant by email with questions regarding the "internal evaluation of the fruits and consensus . . . made by the US government" from the U.S. – Sino Strategic Economic Dialogue, and also wanted information about what types of pressures the United States government planned to place on the Chinese government if certain expectations were unmet. Finally, he inquired about the "internal attitudes taken by the high-level American officials." *Id.* ¶ 23.

When, on May 19, 2011, the defendant answered Co-Conspirator B's tasking with responsive, but publicly available information, Co-Conspirator B clarified, "What they are looking for *is what they cannot find on Internet*." *Id.* ¶ 24 (emphasis added). On the same date, Co-Conspirator B, consistent with his PRCIS affiliation, emphasized caution in their mode of communication. He warned the defendant, "If you find something next time don't send them by email bcs [sic] others also can catch it with Internet." Co-Conspirator B offered to pick up personally any information the defendant passed. *Id.* Due to their requests for information and their methods, the defendant believed that Co-Conspirators B and C were agents of the Chinese government. *Id.* ¶ 27. As the defendant admitted when she pled guilty, she was aware that the information sought by Co-Conspirators B and C was information internal to the State Department or U.S. Government that would provide an advantage to Chinese officials. *Id.*

Co-Conspirators B and C rewarded the defendant heftily for the non-public, U.S. government information she provided. In all, the defendant admitted to receiving the equivalent

of approximately U.S. $20,000 in Chinese currency from Co-Conspirator B and Co-Conspirator C over the course of her dealings with them. *Id.* ¶ 28. In addition, the defendant and Co-Conspirator A received valuable gifts from Co-Conspirators B and C, which were worth tens of thousands of dollars themselves. These gifts took the form of air travel for the defendant or Co-Conspirator A, including roundtrip tickets to the United States and to Thailand for Co-Conspirator A. Co-Conspirators B and C even paid *tuition, rent, and living expenses* for Co-Conspirator A for approximately one year while he was enrolled in a fashion design program in China. They also provided many smaller gifts of electronics, local goods, or other merchandise for both the defendant and Co-Conspirator A. *Id.* ¶ 29. Further, during this period, Co-Conspirator B and Co-Conspirator C performed numerous services for the defendant and Co-Conspirator A, such as lining up employment for Co-Conspirator A, purchasing goods or services via the internet, and assisting Co-Conspirator A with passport and visa issues. *Id.* ¶ 30. In total, the amount of gifts, money and services the defendant and Co-Conspirator A received during the period of the conspiracy exceeded $40,000, without accounting for the salary that the defendant earned from the State Department. *Id.* ¶ 31. The defendant received these gifts during her employment by the State Department, and failed to report any of them to the State Department, despite reminders given to the defendant about her obligation to report them. *See*, *e.g., id.* ¶ 22.

### D. The Defendant Made Extensive Efforts to Hide Her Criminal Conduct Through Lies and Destruction of Evidence

The defendant went to great lengths to hide this criminal conduct. On October 26, 2014, the defendant submitted via electronic wire her completed SF-86 questionnaire for her national security clearance background check. The form warned her that lying on it was a crime. Despite this warning, the defendant lied by stating she had had no close and/or continuing contact with any

7

foreign nationals over the prior seven years. *Id.* ¶ 35. The defendant later modified her disclosure to include a few foreign nationals—with whom she had far less extensive conduct than with Co-Conspirators B and C—but never disclosed her close and continuing contact with Co-Conspirators B and C. *Id.* ¶ 45. She also lied by claiming to have no foreign government contacts over the same period. *Id.* ¶ 36. When meeting face-to-face with a background investigator about her security forms, she continued to lie. The defendant lied about Co-Conspirator A's travel in China. *Id.* ¶ 49. She lied about her acceptance of financial support other than her employment. *Id.* She continued to lie about her foreign contacts. *Id.* She lied about her associations with foreign intelligence services. *Id.*

As the defendant progressed through her background check, she took affirmative steps to hide that she had been providing sensitive U.S. government information to the Chinese government for years. For example, on September 9, 2015, the defendant called Co-Conspirator A and asked him how to delete her WeChat account, which she had used to communicate with Co-Conspirators B and C. *Id.* ¶ 47. Two days later, when discussing her security interview with Co-Conspirator A, the defendant told Co-Conspirator A that she had only disclosed his travel to Africa, and she asked Co-Conspirator A, if contacted, to make sure he "didn't say anything about . . . um . . . ya know," referring to China. *Id.* ¶ 51.

On September 13, 2015, when Co-Conspirator B asked the defendant whether she had cleared her background check, the defendant immediately responded, "Clear all messages please. Everything below . . . ." *Id.* ¶ 52. That same day, the defendant used a calling card to call Co-Conspirator B. During their call, Co-Conspirator B asked the defendant whether he should send her $5,000. The defendant responded, "No, no, no, no, no. No, no, no, no, no." She clarified,

"I will tell you a little later.   You know when it's all, when it's all finished."   Co-Conspirator B responded, "Okay, okay, no problem. . . I will wait."   The defendant then encouraged the deletion of their prior communications.   *Id.* ¶ 53.

On June 7, 2016, after Co-Conspirator A boarded a plane bound for China, he spoke by phone with the defendant.   Notably, the defendant instructed Co-Conspirator A, "If you happen to talk to [Co-Conspirator B] or any of them, just say… [I am] working in D.C."   The defendant aptly added, "I'm sure they'll ask – *they're spies.*"   *Id.* ¶ 54 (emphasis added).

On August 23, 2016, the defendant participated in a voluntary interview with FBI agents, prior to which the agents advised the defendant it was a crime to lie to them.   Nonetheless, the defendant again lied about her foreign contacts and receipt of gifts from foreign nationals, even volunteering, "That's the kind of stuff we have to report."   *Id.* ¶ 58.   Three hours after completing this interview, the defendant called Co-Conspirator A from her cellular phone.   Even though Co-Conspirator A stated in response to defendant's question that he had not received a scholarship while attending fashion school in China, the defendant falsely insisted that he did—as she had falsely stated in her earlier FBI interview.   *Id.* ¶ 59.

About seven minutes after their call concluded—in yet another attempt to obfuscate her criminal activity—the defendant called Co-Conspirator A from a phone booth three floors below her State Department office.   *Id.* ¶ 60.   In this call, the defendant expressed certain concerns to Co-Conspirator A.   She noted that CBP (U.S. Customs and Border Protection) had previously stopped her, searched her bags, and asked questions.   The defendant then explained how earlier that day, the FBI had asked questions about where she had been and why.   The defendant relayed to Co-Conspirator A that she told the FBI she had not taken foreign money or gifts, and that Co-

Conspirator A had been on scholarship while at the art school.   The defendant explained to Co-Conspirator A that during a national security clearance investigation, investigators ask questions regarding family due to the level of clearance and access of the clearance holder.   As a result, the defendant explained that Co-Conspirator A needed to be careful with what he said and did, because his actions could lead back to the defendant.   *Id.*

Co-Conspirator A told the defendant, apparently for the first time, that he too was stopped by CBP after his most recent trip to China.   CBP searched his belongings outside his presence and required him to unlock his phone, just as they had done with the defendant.   This information prompted the defendant to express concern and speculate that CBP's actions had something to do with their visits to China, and that they should "stay away from that for now."   The defendant asked Co-Conspirator A when he studied in China, to which Co-Conspirator A answered 2012 to 2013.   The defendant reiterated her point from the earlier call that Co-Conspirator A was "on scholarship, and they paid for your housing," expressing that she did not want any trouble.   *Id.*

That evening, the defendant called Co-Conspirator A again.   During the call, the defendant told Co-Conspirator A that she was uncomfortable with CBP going through her iPhone, so she got a new phone.   The defendant advised Co-Conspirator A to clean his "stuff up," and to be mindful of his words and actions.   *Id.* ¶ 61.   The defendant also emailed Co-Conspirator A that evening, "I'm sorry u were harassed at airport.   U should have told me.   When are you coming home for a visit?   Be mindful and clean up your computer, Facebook etc.   People will hunt for anything." *Id.* ¶ 62.

The next day, on August 24, 2016, the defendant sent Co-Conspirator A an e-card message using the service Birthday Alarm.   The message's subject was "Happy Birthday," even though

Co-Conspirator A's birthday occurred five days before, and the defendant had conveyed birthday greetings by phone to Co-Conspirator A on his actual birthday.   The message, however, had little to do with Co-Conspirator A's birthday.   To the contrary, it read,

> I hope you enjoyed your day. May Allah bless you with health and happiness. Btw delete all email messages and contact information in your email and phone pertaining to [Co-Conspirator B] and [Co-Conspirator C] – I don't want any trouble going forward ok – please do this immediately! Messages, nos, anything having to do with that fashion school your apartment anything – even from wechat, fb, skype, etc u got me?"

*Id.* ¶ 63. That same day, August 24, 2016, the defendant asked a T-Mobile representative whether it was possible to batch delete numbers from an iPhone 6s.   *Id.* ¶ 64.

On January 26, 2017, the defendant met in her home with an FBI undercover employee ("UCE") whom the defendant believed was an agent of the PRC government associated with Co-Conspirators B and C.   In a conversation that lasted approximately one-and-a-half hours, the UCE explained that he worked for the MSS (the Chinese Ministry of State Security)[3] and thanked the defendant for her past assistance to the MSS.   The defendant did not deny her past assistance, but did refuse to continue providing assistance, blaming the fact that she now had "to do security stuff all the time."   *Id.* ¶ 65.

On March 28, 2017 the defendant was arrested.

## III.   DETERMINING THE SENTENCE

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   The Guidelines are

---

[3] The MSS is an institution similar to the FBI and Central Intelligence Agency combined under one intelligence directorate responsible for counter-intelligence, foreign intelligence, and political security on behalf of the government of China.

"the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." *Id.* at 46-49.   The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).   *Id.* at 49-50.   Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a).   *United States v. Rita*, 551 U.S. 338, 347-50 (2007).   While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 92 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity . . . to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" *id.* at 574 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 109 (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

The § 3553(a) factors include (1) "the nature and circumstances of the offense"; (2) the "history and characteristics of the defendant"; (3) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (4) the Sentencing Guidelines and related Sentencing Commission policy statements; and (5) "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

### A.      United States Sentencing Guidelines Calculation

The plea agreement sets forth the parties' agreement that, pursuant to U.S.S.G. §2C1.1, the base offense level is 14 because the defendant qualifies as a "public official" under 18 U.S.C. § 201(a)(1), and since the "value of anything obtained . . . by the public official" was more than $550,000, 14 levels are added pursuant to U.S.S.G. §2C1.1(b)(2).   Additionally, the defendant obstructed justice, so two levels are added pursuant to U.S.S.G. §3C1.1 and commentary note 4(D), for an adjusted total offense level of 30.   After subtracting three levels for the defendant's acceptance of responsibility, the defendant's Sentencing Guidelines Level is determined to be Level 27.   With no criminal history, the applicable guidelines range is 70 to 87 months.

### B.      Statutory Penalties

The defendant is facing a maximum sentence of five years' imprisonment, a fine of not more than $250,000, or both, for her conviction.   18 U.S.C. §§ 371, 3571(b)).   Notably, the low end of the applicable sentencing guideline range is higher than the statutory maximum.

### C.      Analysis of Factors Enunciated in 18 U.S.C. § 3553(a)

As discussed in detail below, an analysis of the factors enunciated in 18 U.S.C. § 3553(a) demonstrates that the imposition of five years of incarceration, to be followed by three years of supervised release, along with a fine equivalent to the value of the cash and gifts the defendant and Co-conspirator A received, is appropriate for this offense.

#### 1.  The Nature and Circumstances of the Offense

This is a serious offense, which put the security of the United States at risk.   Over a period

of several years, the defendant, the holder of a TOP SECRET clearance, knowingly and repeatedly abused the trust placed in her by the United States by conspiring with others to hide her contacts with foreign intelligence personnel, whom the defendant herself referred to as "spies."   SOF ¶ 54. The defendant used her position at the State Department to provide these Chinese spies with non-public, sensitive U.S. government information in return for cash and gifts.   The defendant performed *dozens* of acts in furtherance of this conspiracy over a period of *years*.   She lied repeatedly—in writing and in-person—to her employer, to background investigators, to U.S. law enforcement in order to keep this conspiracy going.   She attempted to destroy or delete evidence and, appallingly, she also involved a close member of her own family, urging that close family member to destroy evidence, to lie to federal investigators, and to obstruct justice.

In addition, there can be no doubt that the defendant's actions would have benefited the PRCIS and the government of China and hurt the United States.   As Mr. Higgins described in his declaration:

> Based on the information Claiborne admitted to providing the MSS in statements to the FBI, I assess that information provided to PRCIS by Claiborne could have substantial intelligence value to the Chinese government.   I further assess that the PRCIS could utilize the knowledge and experiences gained from their successful recruitment of Claiborne to target U.S. government personnel vulnerable to recruitment and enhance their ongoing intelligence collection operations against U.S. diplomatic facilities.   Any such benefits received by PRCIS likely also resulted in corresponding losses to overall State Department security.

Higgins Declaration at ¶ 4.   The positive feedback the defendant received from the MSS,[4] the length of their relationship, and the size and number of gifts, services, and cash provided to the

---

[4] For example, on January 13, 2012, Co-Conspirator C emailed the defendant, saying, "There is some feedback about our last talk, which I think is positive."   *Id.* ¶ 26.

defendant and Co-Conspirator A confirm her utility to the MSS.   *See* Higgins Declaration at ¶ 10. In particular, the amount of compensation the defendant received indicates that she "was seen as a valued intelligence source by decision makers and those responsible for resource allocation within the PRCIS."   *Id.*   Further, it is unlikely that the PRCIS would have invested this amount of time, effort and resources without having received information of significant value to the Chinese government.   *Id.*

The internal State Department information the defendant provided to Chinese intelligence agents undoubtedly, as the defendant expected, "provide[d] an advantage to Chinese officials." SOF ¶ 27.   Mr. Higgins also explained that the provision to a foreign intelligence service of internal State Department information, even if not classified, can be very harmful to the United States.   "Internal deliberations can provide insights into how key DOS officers weigh risk, what their opinions are on topics that they would not otherwise share with Chinese government officials, and where they are prepared to draw the line on negotiating points."   Higgins Declaration at ¶ 5. In sum, "[a]ccess to the internal deliberations of a foreign competitor or adversary"—such as the information the defendant provided to the MSS—is information that is "given a very high value by any intelligence service."   *Id.* ¶ 5.

### 2.  The History and Characteristics of the Offender

The characteristics of the defendant also support a sentence of five years.   The defendant was an employee of the federal government who was trusted with a Top Secret security clearance. The defendant failed her obligations and betrayed that trust many times over a period of years in exchange for money and gifts from a Chinese intelligence agency.   The many lies the defendant told and the steps she took to conceal her arrangement with the members of Chinese intelligence

service demonstrate plainly that she knew her conduct was illegal and very serious.   *See, e.g.*, SOF ¶¶ 49, 58-59 (recounting some of the lies the defendant told a background investigator and the FBI); *id.* ¶¶ 52-53 (instructing Co-Conspirator B to delete their prior communications); *id.* ¶ 60 (calling Co-Conspirator A from a phone booth at the State Department rather than her personal desk or cell phone to discuss her interview with the FBI); *id.* ¶ 63 (using Birthday Alarm service to send a message to Co-Conspirator A so it would not be detected); *id.* ¶¶ 61, 63 (instructing Co-Conspirator A to delete communications that could incriminate the defendant).   The purpose behind the defendant's participation in the conspiracy was clear: money.   Ultimately, the defendant was willing to betray her country and involve a close family member in a criminal conspiracy in exchange for cash, plane tickets, and gifts to her close family member.

### 3.   The Need to Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and to Protect the Public

Sentencing the defendant to five years of incarceration will serve the governmental interests in providing a just punishment that sufficiently deters others and protects the public.   The defendant's actions to further the conspiracy to defraud her own employer put at risk U.S. national security interests for the reasons stated above and in Mr. Higgins's declaration.   The seriousness of the offense demands a sentence of five years, which is as close as possible to the estimated sentencing guidelines range; any lesser sentence signals a reticence on behalf of the United States to punish those who would lie and conceal their own activities in order to secretly work for a foreign power.   Those who hold and seek government positions of trust must understand that the consequences for betraying that trust are severe.

**4.    The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).   The charge to which the defendant pleaded guilty—Conspiracy to Defraud the United States—encompasses a wide variety of possible activities.   Here, the defendant admitted as part of her plea that she supplied sensitive, internal State Department information to a foreign intelligence service as a part of that conspiracy.   While the defendant indicated that none of the information provided in this case was national defense information, and the defendant was not charged with espionage under 18 U.S.C. § 794, the defendant's admitted provision of sensitive, unclassified U.S. government information to a foreign intelligence service, allows an analogy to cases charged under that statute.[5]   Admittedly, when defendants are convicted of espionage, the government has proven that the defendant provided, or conspired or attempted to provide, national defense information to a foreign government or agent.   *See* 18 U.S.C. § 794.   In such cases, the sentencing guidelines are driven by the level of classification of the information at issue.   *See* U.S.S.G. § 2M3.1.   Recently, Kevin Mallory was sentenced to twenty years for conspiring to provide TOP SECRET national defense information to the Chinese government.   *See United States v. Mallory*, No. 1:17-cr-00154 (E.D. Va.).   A sentence of five years in this case, as opposed to the far longer sentence in a case charged under the Espionage Act, properly weights the internal, non-public, but not classified, information the defendant provided to a foreign government, while

---

[5]  The Government found no comparable sentencing precedent for a conviction for a § 371 conspiracy involving conduct of this kind.

acknowledging the seriousness of this particular conspiracy to defraud the United States.

Considering all of the factors described above, a sentence of five years imprisonment is appropriate for the defendant's years-long conspiracy, which resulted in the provision, to the Chinese government, of non-public, sensitive U.S government information in exchange for significant cash and gifts for the defendant and Co-Conspirator A.

## IV.    CONCLUSION

For the reasons stated above, the government respectfully requests that the Court sentence the defendant to five years of incarceration and three years of supervised release, and a fine equivalent to the value of the gifts and services provided to the defendant and Co-Conspirator A during the course of the conspiracy.

Respectfully Submitted,


JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

By:    _____/s/_____
THOMAS A. GILLICE
Assistant United States Attorney
D.C. Bar # 452336
555 4th Street, NW
Washington, DC 20530
202-252-1791


_____/s/_____
JULIE A. EDELSTEIN
D.C. Bar # 976558
Deputy Chief
EVAN N. TURGEON
D.C. Bar # 1010816
Trial Attorney
Counterintelligence
 and Export Control Section

18

National Security Division
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
202-233-2260