IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | :  CRIMINAL NO. 17-CR-69 |
| | : |
| CANDACE MARIE CLAIBORNE | : |
| | : |

### Declaration of Supervisory Special Agent Paul Higgins

I, Paul Higgins, declare as follows:

1. I have been a Special Agent with the Diplomatic Security Service, U.S. Department of State for over 13 years. I am currently a Supervisory Special Agent serving as the Western Hemisphere Affairs Branch Chief, Investigations Division, Office of Counterintelligence, Diplomatic Security Service within the U.S. Department of State (State Department or DOS.) I have also served as the Regional Security Officer (RSO), U.S. Consulate General, Chengdu, China, as an Assistant Regional Security Officer (ARSO), Tallil, Iraq; Assistant Regional Security Officer – Investigator (ARSO-I), U.S. Embassy Jakarta, Indonesia; ARSO U.S. Embassy, Islamabad, Pakistan; as well as in various domestically based assignments. I am intimately familiar with security operations at U.S. diplomatic facilities. I have received multiple briefings and attended formal training sessions regarding the methodologies employed by various Foreign Intelligence Services (FIS) including the People's Republic of China's Intelligence Services (PRCIS), one element of which is the Ministry of State Security (MSS). In my role as RSO in Chengdu, China, I gained first-hand experience in counterintelligence issues posed by the PRCIS and the MSS. I have delivered hundreds of defensive counterintelligence briefings, conducted a large number of counterintelligence-focused interviews, and lead various ongoing investigative efforts into MSS operations directed against the United States Government.

2. This declaration sets forth the Office of Counterintelligence's assessment of the impact of the actions of Ms. Candace Claiborne, a former DOS employee, on counterintelligence concerns of the State Department. The information and opinions provided in this declaration are informed by and based on my years of experience investigating counterintelligence cases, leading defensive counterintelligence efforts at multiple U.S. diplomatic facilities, and in particular by my experiences working in China as an RSO. For information regarding the defendant's conduct, I relied solely on the Statement of Facts in support of her guilty plea, and on statements provided by Claiborne to the FBI, which prosecutors tell me have been produced to the defense.

3. MSS is a professional, large-scale intelligence service with a global presence. MSS may be described as an institution similar to the Federal Bureau of Investigation (FBI) and

the Central Intelligence Agency (CIA) combined under one intelligence directorate. Their number one intelligence collection target is the United States, which they target across a wide swathe of sectors, including government, defense contracting, emerging technologies, and intellectual property, among others. When targeting the United States, MSS and other elements of the PRCIS do not exclusively focus on the collection of classified information. MSS will attempt to recruit human assets, influence decision-makers, penetrate think-tanks and media organizations as well as conduct a variety of technical intelligence collection operations, including cyber-attacks. It is not a requirement for all of these operations to result in the clandestine collection of classified information for them to be assessed as a successful intelligence operation by PRCIS leadership. MSS also accepts that many collection operations will fail, or take extended periods of time to achieve the intended goals.

4.       Based on my review of the descriptions of the defendant's conduct in her statements to the FBI and in the Statement of Facts, and on my training and experience, Candace Claiborne's activities while employed by the U.S. Department of State appear in my opinion to be consistent with a deliberate, long-term intelligence operation, including one undertaken by the MSS. Targeting a United States State Department employee while that employee was posted in China would allow the MSS relative ease of managing this relationship and minimized operational security concerns for MSS members. Based on the information Claiborne admitted to providing the MSS in statements to the FBI, I assess that information provided to PRCIS by Claiborne could have substantial intelligence value to the Chinese government. I further assess that the PRCIS could utilize the knowledge and experiences gained from their successful recruitment of Claiborne to target U.S. government personnel vulnerable to recruitment and enhance their ongoing intelligence collection operations against U.S. diplomatic facilities. Any such benefits received by PRCIS likely also resulted in corresponding losses to overall State Department security.

5.       The nature of the development of Claiborne's relationship with MSS is entirely consistent with how I have observed MSS operate across a broad range of intelligence activities known to me due to my professional responsibilities. In her admissions, Claiborne claimed that she provided only unclassified materials to MSS, such as internal State Department deliberations or positions regarding U.S. relations with China. Regardless of the level of classification, however, MSS access to this information may nonetheless damage our collective national security. One example of how unclassified information could be beneficial to PRCIS, and damage the national security of the United States, can be seen in how MSS would benefit from access to DOS internal deliberations. Internal deliberations can provide insights into how key DOS officers weigh risk, what their opinions are on topics that they would not otherwise share with Chinese government officials, and where they are prepared to draw the line on negotiating points. Internal deliberations can also offer "predictive" intelligence value – they do not merely report on events that have already taken place, but instead can give insight into what will take place in the future, further enhancing the value of this type of information. Access to the internal deliberations of a foreign competitor or adversary is information given a very high value by any intelligence service.

6.      Someone in Claiborne's position would be a person of interest to an FIS, including MSS, due to her position as a TOP SECRET clearance holder working for the DOS. Plea documents reveal that Co-conspirator B communicated regularly with Claiborne and Co-conspirator A as early as 2007. Co-conspirator B continued these communications for a number of years prior to introducing Claiborne to Co-conspirator C, an MSS officer in or around 2011, and the two began tasking Claiborne with specific requests for internal U.S. government information. At no point during this multi-year process did Claiborne take appropriate steps to report her relationships with these Chinese nationals, who were involved in spotting and assessing her, which she was required to do per DOS regulations. Nor did she report the various and numerous gifts she received, including gifts "in kind" such as travel expenses and educational expenses for a family member. The vast majority of gifts that she received from her MSS associates, including those consisting of cash, were subject to mandatory reporting requirements in accordance with DOS regulations. Claiborne's lack of reporting took place in spite of regular briefings she received from Diplomatic Security (DS) agents and analysts both in the U.S. and at her various overseas postings. Claiborne's reporting of these contacts or gifts would have resulted in DS conducting appropriate interagency checks on these Chinese nationals. It is possible that the results of these interagency checks could have permitted DS to learn of MSS activity and to intervene. Claiborne's failure to report these contacts and gifts instead resulted in MSS having the freedom of action to continue to take advantage of their relationship with Claiborne over an extended period of time.

7.      Claiborne indicated in her statements to the FBI that she informed MSS of internal deliberations on a range of issues of interest to the Chinese government. These issues included such topics as internal discussions on U.S.-China summit meetings, Chinese students in the U.S., Embassy staff opinions on intellectual property rights issues, and deliberations on issues related to the South China Sea. As just one example, Claiborne indicated she was tasked with providing information about a senior member of the Chinese Communist Party, who stayed at the U.S. Consulate General Chengdu, China, for an extended period of time in February 2012. Media reporting of this highly sensitive and politically charged incident stated that Wang Lijun, vice-mayor of Chongqing (a city of 18 million), remained at the U.S. Consulate Chengdu for approximately 30 hours in an attempt to defect prior to surrendering to Chinese authorities. This media reporting further claimed that Wang revealed to the U.S. government details of the murder of a British citizen by the wife of a candidate for the Chinese Politburo. This incident had serious ramifications for the security of U.S. diplomats living in Chengdu, the U.S.-China bilateral relationship, and led to rumors of an attempted coup in Beijing. Claiborne admitted to being tasked on this issue and to searching DOS computer databases for information based on that tasking from MSS.

8.      A key concern for the security of our overseas diplomatic facilities is related to how a foreign intelligence service may attempt to leverage our Locally Employed (LE) Staff against U.S. interests. I am aware of multiple MSS attempts to recruit LE Staff in order to have them report about information of interest regarding U.S. diplomats. Claiborne passed information on at least two occasions to MSS about LE Staff vacancies at U.S. diplomatic facilities in China. One of these job openings was for a motor pool driver. The other was for a

position working as a domestic helper at the residence of the United States Ambassador to China in Beijing. In my expert opinion, both of these LE Staff positions have significant potential to be of value to MSS officers looking to subvert our local State Department colleagues and coerce them to report on the activities of U.S. diplomatic staff.

9. MSS have the capability to leverage full-spectrum collection operations against the entities they target, including the U.S. government. Claiborne admitted to receiving various electronic devices from MSS members and cannot rule out the possibility that she carried one such device, an iPhone, into U.S. Embassy Beijing. If Claiborne had reported these items to DOS security personnel, security and counterintelligence experts would have had the opportunity to retrieve the device for inspection or otherwise investigate its capabilities.

10. Claiborne admitted to receiving the equivalent of approximately $20,000 in U.S. currency by way of compensation from PRCIS while she was in contact with MSS officers. She also admitted to receiving numerous gifts of significant value from MSS officers – for example, airline tickets, tuition expenses for a family member, and various gifts. The length of Claiborne's relationship with the MSS, as well as the evident time and resources the MSS devoted to this relationship, suggest that MSS found the materials provided by Claiborne to be useful and not available to them through other avenues. Based on my expert opinion, this amount of compensation indicates that Claiborne was seen as a valued intelligence source by decision makers and those responsible for resource allocation within the PRCIS. In my experience, it is unlikely that MSS would have invested this amount of resources, including the time and effort of their own staff, without having received information of significant value to the Chinese government. In addition, as with any operation, MSS likely gained valuable insight and information from their long-term relationship with Claiborne.

11. Ultimately, Claiborne's failure to report gifts and foreign contacts resulted in the provision of information to the Chinese government that, in my opinion, had the potential to cause harm to the United States Department of State and to the national security of the United States.

SSA Paul Higgins
Branch Chief, Western Hemisphere Affairs
Investigations Division
Office of Counterintelligence
Diplomatic Security Service
U.S. Department of State