**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 17-cr-69 (RDM)** |
| | : | |
| **CANDACE CLAIBORNE,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**EMERGENCY MOTION FOR COMPASSIONATE RELEASE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Opposition to Defendant's Emergency Motion For Compassionate Release ("Motion" or "Def.'s Mtn."). The defendant has filed a motion to reduce her sentence under what is known as compassionate release.  In order to succeed, the defendant carries the burden to show, first, that she has exhausted her administrative remedies available from the U.S. Bureau of Prisons ("BOP") and; second, that "extraordinary and compelling reasons" are present that warrant a reduction in her sentence.  As discussed below, she has not carried her burden in any respect.

**SUMMARY**

The defendant is incarcerated in a facility that as of this writing has had <u>no</u> inmates who have tested positive for COVID -19.  This achievement reflects the significant efforts by the United States Bureau of Prisons ("BOP") and Federal Correctional Institution ("FCI") Hazelton, the facility where the defendant is incarcerated, detailed below being made to protect both staff and inmates.  Despite her insistence to the contrary, the defendant has no health condition considered by health experts at the CDC as placing her in a high-risk category were she to contract COVID-

19.   As other judges have ruled, the mere existence of the coronavirus and the possibility of contracting COVID-19 therefrom does not constitute an "extraordinary and compelling reason" supporting the defendant's release.

Further, the defendant has failed to exhaust the administrative remedies available to her through the BOP, since she has not asked the warden to consider any health conditions she raises with this Court.  While the defendant requested that BOP her release her on a previous occasion, she has failed to ask that the BOP rule on her current request.  This is no mere semantic distinction – the defendant's prior request to the BOP contained entirely different reasons than those defendant now asks this Court to consider.  As a result, the facility has not been given an opportunity to consider the health conditions that the defendant now claims support her release.  Since she has failed to exhaust her administrative remedies, this Court cannot now decide this motion.  For these and the further reasons detailed below, the Defendant's Motion should be denied.

## FACTUAL BACKGROUND

I.      **BOP'S RESPONSE TO THE COVID-19 PANDEMIC**

FCI Hazelton's record of maintaining inmate's health has been supported by the efforts of the BOP nationwide in response to the pandemic. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social

distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there are exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are

barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will

4

materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Exhibit A (Mem. for Director of Bureau of Prisons).

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

The defendant's attempts to portray the situation at all BOP facilities as dire are unsupported both in her motion and by the available facts.  Despite the defendant's claim that "70% of inmates tested are positive for COVID-19" (Def.'s Mtn. at 2), current figures provided by the BOP as of June 12, 2020[1] indicate that 16,798 tests have been conducted, with 6,059 returning positive, for a 36% positive rate.  Further, this rate can be expected to be high given that these numbers reflect only tests, not number of inmates, as some inmates may be tested on multiple occasions.  The defendant does not indicate the source of her data regarding the population at large when indicating that "the rate of infection inside the BOP is seven times the amount in the United States generally" (*see id.*) and in any case, appears to compare rates of positive tests to rates of infection.  Further, the defendant's argument that "once this novel coronavirus enters a prison, the BOP has shown no ability to contain the infection" (*Id. at 3*), is belied by the large number of facilities reporting no or few active cases and a larger number of persons who have recovered.

## II.       CONDITIONS AT FCI HAZELTON AND BOP

The BOP website for FCI Hazelton indicates that the facility houses approximately 1746 inmates, 482 of whom are housed in the secure female facility where the defendant resides.  No

---

[1] *See* https://www.bop.gov/coronavirus/index.jsp for figures that BOP indicates are updated regularly.

inmates have ever tested positive for COVID-19 at FCI Hazelton.  A single staff member, who does not work in the unit that houses the defendant, tested positive.  That staff member quarantined and has now recovered.  No inmates on the defendant's housing have now or previously tested positive for COVID 19.  The defendant does not share a cell with any other inmates.  Stringent policies have been implemented at FCI Hazelton, including a modified lockdown in the defendant's unit, and are designed to minimize the risk of contact with infected persons.

## III.   DEFENDANT'S CONVICTION AND REQUESTS FOR A SENTENCE REDUCTION

Defendant Candace Claiborne joined the Department of State ("State Department" or "DoS") in 1999 as an Office Management Specialist ("OMS").  As a requirement of her position, the defendant held a TOP SECRET security clearance and had access to classified information.  Due to her position at the State Department, the defendant had an obligation to report foreign contacts and refrain from accepting all but minimal foreign gifts.  As a security clearance holder, she owed the United States a unique degree of loyalty.  Indeed, when the defendant joined the State Department, she swore an oath:  "I will defend the Constitution of the United States against all enemies foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office . . . ."  ECF Dkt. # 58 (Statement of Facts (hereinafter, "SOF")) ¶ 12.

Notwithstanding these obligations, the defendant maintained a close relationship with two agents of the People's Republic of China ("PRC") Intelligence Service ("PRCIS").  SOF ¶ 10 *et seq.*  For years, she failed to report her foreign contacts, and then provided her Chinese handlers internal State Department documents and information in exchange for extensive gifts, monies, and services provided to her and a close family member.  The defendant further took steps to conceal

these contacts and gifts, lying to her employer and to law enforcement and destroying evidence in the process.

In the words of Department of State Counterintelligence Branch Chief Paul Higgins, "[the defendant's] failure to report gifts and foreign contacts resulted in the provision of information to the Chinese government that, in [his] opinion, had the potential to cause harm to the . . . national security of the United States." *See Declaration of Paul Higgins,* ECF Dkt. # 66-1, (hereinafter, "Higgins Declaration") at ¶ 10.

The defendant was arrested on March 29, 2017 and released on personal recognizance into the High Intensity Supervision Program (HISP). The defendant pleaded guilty on April 24, 2019 and, per the Court's order, self -surrendered on June 5, 2019 and was held without bond. This Court sentenced the defendant to a 40-month term of incarceration on July 9, 2019. After sentencing, BOP designated the defendant to serve her sentence at FCI Hazelton, a BOP facility located in Hazelton, West Virginia. The defendant remains incarcerated at that facility. The BOP projects the defendant's anticipated release date to be April 7, 2022.

On April 17, 2020, the defendant filed a request for release with the staff of FCI Hazelton, asserting: 1. family ties and responsibilities necessitated her release on compassionate release grounds; and 2. "any inmate over the age of fifty is in grave and imminent danger" due to the coronavirus. *See* Gov. Exhibit B, Def's "Emergency Release Motion" at 4, 6. The defendant mentioned no personal health concerns, nor, aside from the general statement regarding age, did she indicate any health related reasons why she might be at higher risk upon exposure to the coronavirus.

The warden denied the request eleven days later on April 28, 2020. *See* Gov Exhibit C. The warden's denial addresses each of the two reasons the defendant set forth in her request. In

finding that the defendant's circumstances do not constitute "extraordinary and compelling circumstances," the warden noted that, according to the defendant's own request, the defendant is "not the sole provider" and that she "helps [her family] out where she can and provides overall general support." Further, the warden apparently indicates that simply being over the age of fifty does not constitute an extraordinary and compelling circumstance warranting release. *Id.*

On June 10, 2020, the defendant moved this court for a sentence reduction in a second motion, unrelated to the first, indicating that personal health factors support her release. This second motion did not raise family responsibilities and obligations, but instead raised personal health conditions the defendant claims make her more susceptible to COVID-19. The claims have not been considered by the warden because the defendant has not raised them.

As of June 11, 2020, BOP records indicate that the defendant's anticipated release date, assuming she earns all available "good time" credits, is April 7, 2022. As of that date, the defendant has served 35.9% of her sentence.

## IV.    THE DEFENDANT'S HEALTH CONCERNS

The defendant alleges, for the first time in this motion, "elevated weight" "borderline diabetes" and rheumatoid arthritis put her at higher risk for contracting COVID-19.

Here again, the defendant's arguments are unsupported by her brief or by other available facts. The defendant's medical records, attached hereto as Exhibit D[2], current as of June 11,

---

[2] [2] The full medical records of the defendant as received from the BOP is attached to the Government's Motion to Seal Exhibit, filed contemporaneously herewith. Because these contain the defendant's medical information and personally identifiable information, the government moves the Court to allow these exhibits to be filed under seal.

2020, list her health problems.  *See* Exhibit D at p. 22.   Neither obesity, nor other weight issues

are noted.  Neither diabetes, nor pre-diabetes are noted.  Rheumatoid arthritis is not noted.[3]

## LEGAL FRAMEWORK

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once

it has been imposed,' 18 U.S.C. § 3582(c); but the rule of finality is subject to a few narrow

exceptions." *Freeman v. United States,* 564 U.S. 522, 526 (2011). A court "may reduce the term

of imprisonment" in certain circumstances, including when, after a defendant "has fully exhausted

all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion [for a

reduction in sentence] on the defendant's behalf or the lapse of 30 days from the receipt of such a

request by the warden of the defendant's facility, whichever is earlier," the court finds both that

"extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is

consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. §

3582(c)(1)(A).   *See U.S. v. Burnette,* 18-cr-329 (BAH) Minute Order issued May 1, 2020.

Defendant's failure to meet section 3582(c)(1)(A)'s exhaustion requirements means that a Court

---

[3] The records appear to the undersigned to indicate that the defendant was tested for rheumatisim on May 28, 2020. *See* Exhibit C at p. 4 (requesting lab tests for rheumatoid factor, and indicating a follow up for her response to MDP and for her lab results.) On June 10, 2020, the defendant was diagnosed with osteoarthritis, not rheumatoid arthritis." *Id.* at 1 (indicating  "Discussed labs. Understands she has osteoarthritis", and indicating no further prescription for MDP).  During that same doctor's visit, the defendant indicated that the MDP medicine she had been provided, did not appear to be working.  *Id.* at 1 (indicating that the defendant stated that "the MDP didn't really help her discomfort.).

Osteoarthritis and rheumatoid arthritis are separate conditions, with different underlying causes.  According to the Mayo Clinic, "osteoarthritis is the most common form of arthritis, affecting millions of people worldwide. It occurs when the protective cartilage that cushions the ends of your bones wears down over time." *See* https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925.  Rheumatoid arthritis "is a chronic inflammatory disorder . . . Unlike the wear-and-tear damage of osteoarthritis, rheumatoid arthritis affects the lining of your joints, causing a painful swelling that can eventually result in bone erosion and joint deformity." *See* https://www.mayoclinic.org/diseases-conditions/rheumatoid-arthritis/symptoms-causes/syc-20353648.

In any event, none of the conditions asserted by defendant constitute conditions that place a person at increased risk to severe COVID-19 infection, according to current guidance from the Centers for Disease Control and Prevention (CDC). *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. In this regard, we note that the CDC recognizes diabetes (not pre-diabetes) and severe obesity (not simply being overweight or even obese) as risk factors. Neither osteoarthritis, nor rheumatoid arthritis, are recognized as risk factors.

"may not modify [defendant's] term of imprisonment." *Id.* § 3582(c).0020.

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[4]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

---

[4]   The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## Arguments

This Court should deny defendant's motion for a reduction in her sentence without prejudice because she has failed to exhaust administrative remedies. Should the Court reach the merits of defendant's motion, the Court should deny it with prejudice on either of two independently sufficient grounds. First, defendant has not established that "extraordinary and compelling reasons" support a sentence reduction; second, defendant has not met her burden to show that a reduction is warranted in light of the relevant § 3553(a) factors. In addition, to the extent that defendant seeks home confinement, this Court lacks statutory authority to direct BOP to transfer her to home confinement.

## I.    This Court Should Deny the Motion Without Prejudice Because Defendant Has Not Exhausted Administrative Remedies.

This Court lacks authority to act on defendant's motion for a sentence reduction at this time. As explained above, § 3582(c) requires that a request for a sentence reduction be presented first to the warden of the facility where defendant is held; only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for a sentence reduction in court. That restriction is mandatory, and it continues to serve an important function during the present crisis. The government is very mindful of the concerns created by COVID-19, and BOP is making its best effort both to protect the inmate population and to address the unique circumstances of individual inmates.

11

As noted, § 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . ." § 3582(c)(1)(A). As the Third Circuit recently confirmed, where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020), *as revised* (Apr. 8, 2020). The vast majority of district courts to address this issue agree. *See, e.g.*, *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (citing numerous cases).[5]

Further, "'a judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only if authorized by statute. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979);

---

[5]       The government notes here that it is aware of two cases in this jurisdiction in which the government has not opposed on exhaustion grounds. One case is *United States v. Samuel H. Powell*. There, the defendant argued in its unopposed motion that there was exhaustion because the parties and the Court previously recommended that BOP release the defendant to home confinement, and BOP had denied the request. 1:94-cr-00316 (ESH), ECF No. 96 at 5. In the alternative, the defendant argued that the Court should waive the exhaustion requirement because it would be futile, given BOP's previous decision on home confinement in that case. *See id.* The government did not file a written response, but it had indicated to the defense that the government did not oppose the release. *See id.* at 1 n.1. The defendant had filed its motion on March 27, 2020, and the Court granted release in an Order that same day. *See Powell*, ECF Nos. 96, 97. One week later, in *United States v. Ghorbani*, the government and defense filed a joint submission that explicitly argued in a footnote that the exhaustion requirement is waivable. 1:18-cr-255 (PLF), ECF No. 129 at 2 n.1. The compassionate release motions filed in these two cases were among the earliest such motions filed here. Regrettably, the government took, either implicitly or explicitly in these cases, a position that is at odds with Department of Justice guidance. In the instant case, as in the other compassionate release motions litigated here, the government asserts the exhaustion requirement, for the reasons stated in the text above.

*United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Consistent with that principle of finality, § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," except in three circumstances: (i) upon a motion for reduction in sentence under § 3582(c)(1)(A), such as that presented by the defendant; (ii) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," § 3582(c)(1)(B); and (iii) where the defendant was sentenced "based on" a retroactively lowered sentencing range, § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence-reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for a reduction—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (internal quotation marks omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[6]

---

[6] The D.C. Circuit has not decided the issue. *See United States v. Smith*, 467 F.3d 785, 788 (D.C. Cir. 2006) (noting that "Congress has, in language with a somewhat jurisdictional flavor, limited district court authority to modify sentences" but also that *Eberhart v. United States*, 546 U.S. 12 (2005), calls such a jurisdictional reading of § 3582(c) into question).

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id.* at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that § 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for a sentence reduction where the defendant has failed to satisfy the exhaustion requirement of § 3582(c)(1)(A).[7]

While the government maintains that the time limitation in § 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of § 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The government raises the rule here, and it must be enforced.[8]

---

[7]   Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden.

[8]   Indeed, even those courts that have concluded that the requirements of § 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g.*, *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (recognizing that even if a court has the "power to adjudicate" a motion under § 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

While judicially created exhaustion requirements may sometimes be excused, it is well settled that a court may not ignore a statutory command such as that presented in § 3582(c)(1)(A). *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("[w]here Congress specifically mandates, exhaustion is required"). Indeed, the Supreme Court recently reaffirmed that principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which it rejected a judicially created "'special circumstances'" exception to a statutory exhaustion requirement. Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856.

Some have suggested that the exhaustion requirement of § 3582(c)(1)(A) may be excused by a court as "futile" during the present pandemic. But there is no "futility" exception, as the Supreme Court has made clear that courts have no authority to invent an exception to a statutory exhaustion requirement. Two district courts have recently rejected the argument that any such futility exception exists under § 3582. *See United States v. Holden*, 2020 WL 1673440, at *5 (D. Or. Apr. 6, 2020); *United States v. Eberhart*, 2020 WL 1450745, at *1 (N.D. Cal. Mar. 25, 2020). While a few district courts have incorrectly excused the § 3582 exhaustion requirement as futile, two of those decisions have rested on the fact that the defendant had a matter of days left to serve on the sentence, a consideration not present in this case. *See United States v. Colvin*, 2020 WL 1613943, at *1 (D. Conn. Apr. 2, 2020) (finding exhaustion futile because inmate had 11 days left on her sentence); *United States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (finding exhaustion futile because inmate had less than 21 days left on his sentence and was recovering from two vicious beatings while in prison); *but see United States v. Zukerman*, 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) (finding exhaustion futile where obese, 75-year old inmate suffered from diabetes and hypertension). At least one of those decisions incorrectly relied on precedent addressing a judicially created—as opposed to statutorily created—exhaustion requirement. *See*

*Perez*, 2020 WL 1546422 at \*2 (relying only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)).[9] And in any event, a request in this context is not futile, because, as explained further below, BOP fully considers requests for sentence reductions. Indeed, BOP often concurs with such requests. During the period from the passage of the First Step Act on December 21, 2018, until mid-March 2020 (before the coronavirus crisis began), BOP consented to a reduction in sentence in 55 cases. The requirement of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be excused.[10]

---

[9]  To the extent *Perez* also suggests that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supports an exception to the exhaustion requirement here, *see* 2020 WL 1546422, at \*2 n.2, that is incorrect. In *Eldridge*, the claimant complied with the "nonwaivable and nonexcusable requirement that an individual present a claim to the agency before raising it in court." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 16 (2000). And while the Court in *Eldridge* recognized that a constitutional challenge "entirely collateral to [the claimant's] substantive claim of entitlement" might evade a statutory exhaustion requirement, 424 U.S. at 330, the defendant's claim for relief in this Court is the same claim he was required to present to BOP. *See also United States v. Demaria*, 2020 WL 1888910, at \*3 & n.8 (S.D.N.Y. Apr. 16, 2020) (explaining the *Perez* error at length and the inapplicability of the cases on which it relied).

[10]  A handful of courts, mostly in the Second Circuit, have agreed in recent weeks with *Perez* that the exhaustion requirement may be negated. *See also, e.g.*, *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (11 days remaining on sentence); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (26 days remaining on sentence); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020); *United States v. Zukerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020); *United States v. Paciullo*, 2020 WL 1862252, at \*2 (S.D.N.Y. Apr. 14, 2020) (court strikes a "compromise" and allows BOP 20 days); *United States v. Russo*, 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020); *United States v. Smith*, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020).

A number of other district courts in the Second Circuit disagree, while virtually every other district court in the country to consider this issue in a reported decision agrees with *Raia* and the government here that the 30-day requirement must be enforced. *See, e.g.*, *United States v. Gillis*, 2020 WL 1846792 (C.D. Cal. Apr. 9, 2020); *United States v. Meron*, 2020 WL 1873900 (E.D. Cal. Apr. 15, 2020); *United States v. Hembry*, 2020 WL 1821930 (N.D. Cal. Apr. 10, 2020); *United States v. Smith*, 2020 WL 1903160 (D. Conn. Apr. 17, 2020); *United States v. Perry*, 2020 WL 1676773 (D. Colo. Apr. 3, 2020); *United States v. Zywotko*, 2020 WL 1492900 (M.D. Fla. Mar. 27, 2020); *United States v. Read-Forbes*, 2020 WL 1888856 (D. Kan. Apr. 16, 2020); *United States v. Boyles*, 2020 WL 1819887 (D. Kan. Apr. 10, 2020); *United States v. Carter*, 2020 WL 1808288 (S.D. Ind. Apr. 9, 2020); *United States v. Hofmeister*, 2020 WL 1811365, at \*3 (E.D. Ky. Apr. 9, 2020) (explaining that the rule is jurisdictional, and perhaps even more necessary during COVID-19 crisis); *United States v. Reeves*, 2020 WL 1816496 (W.D. La. Apr. 9, 2020); *United States v. Lugo*, 2020 WL 1821010, at \*3 (D. Me. Apr. 10, 2020) (extensive analysis, concluding, "The Court regards the language of section 3582(c) as both clear and mandatory."); *United States v. Johnson*, 2020 WL 1663360, at \*3-\*6 (D. Md. Apr. 3, 2020) (concluding in lengthy discussion that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional and, regardless, there are no exceptions to the exhaustion requirement); *United States v. Underwood*, 2020 WL 1820092 (D. Md. Apr. 10, 2020); *United States v. Carden*, 2020 WL 1873951 (D. Md. Apr. 15, 2020); *United States v. Alam*, 2020 WL 1703881 (E.D. Mich. Apr. 8, 2020); *United States v. Mathews*, 2020 WL 1873360 (E.D. Mich. Apr. 15, 2020); *United States v. Annis*, 2020 WL 1812421, at \*2 (D. Minn. Apr. 9, 2020) (Tunheim, C.J.) ("There is no question that COVID-19 is a cause for alarm, and the Court does not fault Annis's concerns, given his health conditions. However, given the scale of the COVID-19 pandemic and the complexity of the situation in federal institutions, it is even more important that Annis first attempt to use the BOP's administrative remedies."); *United States v. Gardner*, 2020 WL 1867034 (D. Minn. Apr. 14, 2020); *United States v. Eisenberg*, 2020 WL 1808844 (D.N.H. Apr. 9, 2020); *United States v. Ogarro*, 2020 WL 1876300, at \*3 (S.D.N.Y. Apr. 14, 2020) (lengthy analysis,

While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies. And this is for good reason: BOP conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

That is especially true during the current crisis. As explained above, BOP must balance a host of considerations in deciding whether to release an inmate to recommend a reduction in an inmate's sentence or grant the inmate home confinement—not only the health of the inmate and BOP staff, but also the safety of the public. BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations in light of on an inmate's background and medical history and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement

---

stating, "In fact, section 3582(c)'s exhaustion proscription is clear as day."); *United States v. Pereyra-Polanco*, 2020 WL 1862639 (S.D.N.Y. Apr. 14, 2020); *United States v. Roberts*, 2020 WL 1700032 (S.D.N.Y. Apr. 8, 2020); *United States v. Woodson*, 2020 WL 1673253 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, 2020 WL 1674137 (S.D.N.Y. Apr. 6, 2020); *United States v. Rabadi*, 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020) (follows "vast majority" of courts); *United States v. Schultz*, 2020 WL 1872352 (W.D.N.Y. Apr. 15, 2020); *United States v. Allen*, 2020 WL 1878774 (N.D. Ohio Apr. 15, 2020); *United States v. Simmons*, 2020 WL 1903281 (D. Or. Apr. 17, 2020); *United States v. Holden*, 2020 WL 1673440 (D. Or. Apr. 6, 2020) (very extensive discussion); *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (cites numerous cases in agreement); *United States v. Petrossi*, 2020 WL 1865758 (M.D. Pa. Apr. 14, 2020); *United States v. Feiling*, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020); *United States v. Fuller*, 2020 WL 1847751 (W.D. Wash. Apr. 13, 2020); *United States v. Carver*, 2020 WL 1604968 (E.D. Wash. Apr., 1, 2020); *United States v. Fevold*, 2020 WL 1703846, at *1 (E.D. Wis. Apr. 8, 2020) ("Not only is exhaustion of administrative remedies required as a matter of law, but it also makes good policy sense. The warden and those in charge of inmate health and safety are in a far better position than the sentencing court to know the risks inmates in their custody are facing and the facility's ability to mitigate those risks and provide for the care and safety of the inmates.").

takes on added—and critical—importance." *Raia*, 2020 WL 1647922, at *2. *See also United States v. McCann*, 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) ("The Court recognizes that these are unsettling times for everyone, including prisoners. But in such a context, the exhaustion requirement of the compassionate release statute is perhaps most important.").

Accordingly, defendant's motion should be denied without prejudice to refiling once she has exhausted administrative remedies.

## II.    Should The Court Reach the Merits, It Should Deny The Motion Because Defendant Has Failed to Present Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction and Has Failed to Show that a Reduction Is Warranted by the § 3553(a) Factors.

Even if this Court had authority to grant defendant's motion for a reduction of her sentence, it should be denied for two reasons. First, defendant has not identified "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement. Second, the statutory sentencing factors do not weigh in favor of her release.

### A.    Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

Defendant's request for a sentence reduction should be denied because she has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the

ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 2020 WL 1647922 at *2; *see also Eberhart*, 2020 WL 1450745 at *2 ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[11] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by

---

[11]    *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[12] that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I). But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution.

In this case, defendant has not shown evidence that she has any medical condition that would make her more vulnerable to becoming seriously ill should she contract COVID-19, nor has she established that there is a known COVID-19 outbreak at her institution. Indeed, defendant has failed to allege any rationale, that would constitute an extraordinary and compelling reason within the meaning of § 3582(c)(1) or U.S.S.G. 1B1.13.  Hence, her motion should be denied.

### B.  The § 3553(A) Factors Strongly Weigh Against the Defendant's Release.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

The Court will recall the nature and the circumstances of defendant's crime, detailed *supra*. As the government argued at the time of defendant's sentencing, the defendant jeopardized and possibly harmed the national security of the United States, and benefited the intelligence services of China, all for her own financial gain.

---

[12]   *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Apr. 2, 2020).

Even if this Court concludes (contrary to the argument set forth in the previous section) that defendant has established "extraordinary and compelling reasons" for a sentence reduction based on the risk of contracting COVID-19, defendant has not established that she would be less vulnerable to COVID-19 if she were released. As we have stated *supra*, as of the filing date of this pleading, the BOP website does not reflect that any inmate at FCI Hazelton, where defendant is serving her sentence, has a reported case of COVID-19.

Accordingly, in light of defendant's record and the totality of relevant circumstances, this Court should summarily deny the motion for a sentence reduction.

**III.     This Court Has No Authority to Direct the BOP to Place the Defendant in Home Confinement.**

Although defendant has not stated this explicitly, implicit in her petition for home confinement is a request that this Court order BOP to place her on home confinement. That request should be denied because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Because defendant's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny his request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently

extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). But defendant's request to serve the rest of his term in home confinement, as opposed to prison, works no reduction to sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. Defendant's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives the Court of jurisdiction to grant home confinement, and because defendant offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for such relief in this forum.[13]

### Conclusion

For these reasons, this Court should deny defendant's motion for a sentence reduction without prejudice for failure to exhaust administrative remedies or, in the alternative, deny the motion on the merits.

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
N.Y. Bar No. 4444188

By: /s/ Thomas A. Gillice
　　Thomas A. Gillice
　　D.C. Bar No. 452336
　　Assistant United States Attorney
　　National Security Section
　　United States Attorney's Office

---

[13] If a court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. *See* § 3583(e)(2).

555 Fourth Street, N.W.
Washington, D.C.  20530
Phone:  (202) 252-1791
Thomas.Gillice@usdoj.gov